**EXHIBIT "D"**

INA KAPLAN

Plaintiff,

V.

HYATT CORPORATION
&
HYATT ZIVA ROSE HALL,

Defendants.

CIVIL ACTION NUMBER. 23-cv-2598CBA-RER

_____/



## DECLARATION OF DANIELLE SHEREEN ARCHER

I DANIELLE SHEREEN ARCHER states that I am over the age of eighteen, and am of sound mind, and am competent to make this declaration. If called as a witness, I would testify as follows:

### Experience and Qualifications

1. I am a citizen of Jamaica having been born on 10th day of November 1978 in the parish of Saint Andrew on the Island of Jamaica. I hold a Bachelor of Science Degree in International Relations and Political Science from the University of West Indies, Mona Campus awarded in 1999 and a Bachelor of Laws from the University of the West Indies, Cave Hill Campus awarded in 2003. I obtained a Certificate of Legal Education from the Norman Manley Law School in September 2005 and was admitted to practice law in all the Courts of the Island of Jamaica on the 27th of November 2005. As of August 2021, I was commissioned for life as a Notary Public for the Island of Jamaica.

2. My address for the purpose of these proceedings is Suite 17 Hargreaves Building, 32 Hargreaves Avenue, Mandeville in the parish of Manchester, Jamaica. I am an Attorney-at-Law with a general law practice focused on Civil and Constitutional matters. I handle criminal matters on referrals only.

3. I am a mediator and a broadcaster, who has often provided legal opinions on matters of public interest on local television and radio.

4. I make this Declaration based upon my own legal experience, my review of the Complaint filed 1:21cv-02089-TW, the background to the matter provided to me by instructed Counsel in this case, as well as my review of the materials attached here as exhibits **"DSA 1- 6"**.

5. I commenced my practice as an Attorney-at-Law with the firm Chancellor & Co which specialized in Commercial and Civil Litigation in November 2005. For the two years prior, I was employed at the said firm as a Paralegal. I departed Chancellor & Co. Attorneys-at-Law in November 2007 to work in public service with the Attorney General's Chambers of Jamaica.

6. Whilst working at the Chambers for the Attorney General I managed more than 300 cases, many of which had to do with negligence by Public Officers. I also handled complex arbitration and mediation matters. Having spent approximately 2 years at the Attorney General's Chambers, I became a sole practitioner in May 2009.

7. I have handled hundreds of personal injury cases, since May 2009, which involve negligence and or occupiers' liability. These cases have included matters in which I have appeared either as Counsel for the Claimant or Instructed Counsel on behalf of other Attorneys. I am often instructed by law firms to represent clients who have a claim of Negligence or Occupiers' Liability. My practice also includes representing attorneys who are accused of negligence or professional misconduct before the General Legal Council, the regulatory body for lawyers in Jamaica. I am also a Consultant Attorney at Law to the law firms of Daly Thwaites Attorneys-at-Law, NealLex Attorneys-at-Law, and Bignall Law. I was previously a Consultant Attorney at Law with Kinghorn & Kinghorn Attorneys-at-Law. During my practice, I have also had cause to tender legal opinions regarding the issue of Occupier's Liability and or Negligence.

8. Some of my most notable involvements were ***Antonette Perrier v McMaster's Meat Mart Limited*** 2011 HCV 03542 delivered September 2017, *McKnight v Kingston Wharves* 2008 HCV 02086 delivered August 2013 and ***Brenda Gordon v Juici Beef Limited*** 2007HCV1042 delivered April 2010.

9. I have appeared in the Assessment Courts regarding matters arising from Negligence and or Occupiers' Liability. Many of these matters like many decisions of the Supreme Court within which most of such claims are filed are unreported. Many matters so settled are the subject of mediation agreements which are private and confidential. Quite often some matters are also settled by way of consent between the parties without the assistance of mediation.

10. I am a litigator with specialist experience in personal injury claims. As a matter of fact, most of my appearances are for claimants in such injuries.

11. I have previously been retained as a foreign law expert in a federal case in the Southern District of Florida and the Northern District of Georgia, Atlanta.

12. Given my experience with 'slip and fall' incidents in Jamaica, I am aware that cases involving citizens of the United States and resorts are often determined in Jamaica in our Civil Courts as a Tort. The actions are often brought as claims for Negligence under the Common Law, and or in the alternative under the Occupier's Liability Act and as a further alternative as a Breach of Contract.

13. I am familiar with the activities of the defendants and similar resorts and have had caused to advise attorneys and individuals in relation to "slip and fall' incidents which give rise to issues touching and concerning Negligence and Occupiers' Liability and or Breach of Contract.

## **OVERARCHING OPINION**

14. I make this Declaration in support of the motion to dismiss the plaintiff's case for **forum non conveniens and improper venue** and set forth the following in support of same:

    (i)    Governing Laws of Jamaica provide an adequate remedy for the alleged injuries.

    (ii)    Jamaica is the appropriate forum to resolve the dispute because (a) it is the location of the incident, (b) the proximity of the witnesses inclusive of the best opportunity to locate witnesses who are no longer employed to the defendants.

    <u>The Effect of the under Jamaican Law of the Mandatory Forum Selection Clause which the Plaintiff agreed to in Signing the Guest Registration Document</u>

15. In the case at bar, the plaintiff did execute a registration card which included a clause acknowledging and agreeing that all services provided at the hotel premises were subject to the applicable laws and regulations in Jamaican courts and subject to Jamaican laws and regulations in Jamaica. It clearly indicates that legal proceedings shall be submitted to the exclusive jurisdiction of the Jamaican courts and subject to Jamaican laws and regulations. The plaintiff clearly waived any challenge to jurisdiction or venue in such court (or applicable law) due to [the plaintiff's] current place of residence or nationality.

16. This *Exclusive Jurisdiction Clause,* also referred to as the *Mandatory Forum Selection Clause,* is common for hotels and resorts in the Caribbean. This clause in the contract between the hotel and a visitor requires that all disputes between the parties shall be (i) adjudicated exclusively by the local courts and (ii) governed by the laws of the local jurisdiction[1]. A copy of the extract relied on is attached and marked **"DSA 1"**.

---

[1] Kodilinye, Gilbert: *Negligence Liability in Caribbean Hospitality and Tourism*, page 23.

17. In Jamaican jurisprudence such clauses are required to be clear and specific. I opine that in the instant case, the said clause being clear and specific. It is apparent that the Plaintiff had an opportunity to read the clause, cross out and or change the clause and remain at the hotel. It is of note to observe that the notice to guest is in bold and clearly expresses the exclusive jurisdiction clause. Accordingly, I opine that the instant plaintiff had a reasonable opportunity to read the clause and a reasonable opportunity to reject it.

18. I have seen a copy of the complaint and noted that it is being brought against the Defendants. However, to the best of my information, knowledge and belief Hyatt Hotels Corporation does not own, manage, operate, or franchise the Jamaican hotel. In fact, and in law, the owner of the hotel is Playa Hall Jamaican Resort Limited. Playa Hall Jamaican Resort Limited is a business registered in Jamaica. Given the exclusive jurisdiction clause, a matter against Playa Hall Jamaican Resort Limited can properly be instituted in Jamaica.

19. It is opined that given that the party which operates the hotel on whose property the incident occurred is in fact a Jamaican Entity, the inclusion of such a clause is not done in bad faith nor was it included to discourage litigation since the courts of Jamaica can properly adjudicate on the matter.

20. It must be noted that the Plaintiff would not incur any additional or unnecessary expense in attending Court in Jamaica as the Civil Procedure Rules[2] permit attendance by video link for trials and all hearings.

21. I have been duly advised by the Counsel for the defendants that the plaintiff has chosen to sue in New York, contrary to the Mandatory Forum Selection Clause. Should the instant court dismiss the instant claim and uphold the Mandatory Forum Selection Clause, the plaintiff would be required to refile his claim. It is my considered view that if such a dismissal occurred, the Jamaican courts would uphold the result given that the clause if clear and unequivocal.

### Applicable Jamaican Law

22. Jamaican Law affords the plaintiff an opportunity to make a claim for compensation arising from alleged injuries on any property including hotels, wherein the said alleged injuries were caused and or contributed by any act or omission of those employed to the hotel and or owned and or were in control of the property upon which the alleged injury was sustained.

23. Jamaican Law affords the instant plaintiff to institute a claim of negligence in common law. Our law is identical to the Common Law of England & Wales. It

---

[2] Civil Procedure Rules 29.3

accepts that owners and or occupiers have a duty of care to their guests and give the guests an opportunity to prove loss and damage.

24. Often guests who are allegedly injured have the benefit of also relying on The *Occupier's Liability Act* which codified the old common law principles of a duty of care which governs the potential liability that occupiers such as hotels have towards their guests. I attached hereto a copy of the legislation marked **"DSA 2"** for identification.

25. Having identified that the owner of the resort where the incident occurred is in fact a Jamaican Company it is a fortiori that the action should be instituted in Jamaican courts which have jurisdiction over the witnesses in the matter. Additionally, the Plaintiff allegedly attended and was treated at a local medical institution such institutions and their employees would also be under the jurisdiction of the Jamaican Courts.

26. In Jamaica the period allowed for filing a claim is 6 years from the date of the incident, this is known as the Defence of Limitation, which is raised only by a Defendant. I am duly advised that the Defendants in the instant case would not be relying on this Defence.

27. Jamaican Law also recognizes that guests can contribute to their alleged injury and as such, once this allegation is pleaded by a Defendant, the Court is empowered pursuant to ***Section 3 of the Law Reform (Contributory Negligence) Act*** to make an apportionment in keeping with the evidence presented. I attached hereto a copy of this legislation marked **"DSA 3"** for identification.

28. In the Jamaican Supreme Court damages for alleged injures are at large. The Court uses the elements of how the injury impacts the individual and the objective element the actual impact on the Plaintiff to grant an award. I attach hereto a copy of a Judgment from Justice Bryan Sykes as he then was to give the Court an appreciation for how damages are assessed in the Jamaican Courts. Justice Sykes is currently the Chief Justice for Jamaica. Attached hereto is a copy of judgment in ***Claim 2005 HCV 294 Icilda Osbourne v George Barned & Anor*** marked **"DSA 4"** for identification.

29. It is common knowledge that Jamaica is a democratic sovereign Island which has a legal system not dissimilar to the United States of America, wherein there is a distinction between criminal and civil matters. Jamaica's legal system mimics that found in the system of our previous colonizers the United Kingdom. It affords layers for review and correction by allowing matters from the lower courts – The Supreme or Parish Court[3] to be reviewed by the Court of Appeal. If a litigant is displeased

---

[3] Each of the 14 parishes of Jamaica have a Court known as the "Parish Court" it is created by statute and affords litigants an opportunity to bring civil claims for negligence (among other the claims) where the damages being sought for less than one million Jamaican dollars. Any claim more than one million Jamaican dollars would be brought in the Supreme Court. Having regard to the alleged injures, it is my considered view that the instant claim would be filed in the Supreme Court.

with the decisions on a matter of law a further appeal can be made to the Privy Council in the United Kingdom. The Constitution of Jamaica secures the Privy Council as our Final Appellate Court. The appellate standard is like that which obtains in the United States of America.

30. Given the injuries in the instant case, the Claim can properly be handled by the Jamaican Supreme Court which is a Court of unlimited jurisdiction. This Court, like any proper functioning Court, is governed by Rules of Procedure. The Judges are independently appointed by the Judicial Services Commission. The Constitution of Jamaica recognizes the separation of powers and insulates the Judicial branch from political interference, it also guarantees the judges security of Tenure.

31. The Supreme Court of Jamaica like that in the United States of America is empowered to issue subpoenas and has the power of enforcement. This ensures that testimony which is required for the fair and just disposition of matters is available. Accordingly, if witnesses who worked at the place of the Defendant wherein the incident was alleged to have occurred are no longer employed to the Defendants, the Court is empowered to issue a subpoena to have them attend and provide the requites evidence.

32. Prior to 2022 there was a problem having matters heard within a reasonable time. However, Practice Direction 19/ 2021 affords an opportunity for cases to be heard quickly once the parties are ready. Attached hereto is a copy of the Practice Direction marked **"DSA 5"** for identification.

33. The Jamaican Judicial system can make fair monetary assessments which take into consideration the value of the plaintiff's loss once he is able to provide proof of such a loss. The said loss would be made in United States Dollars should he be able to prove same.

34. The Jamaican Court can and will once the evidence is provided grant compensation for monies spent on account of the injuries and such an award would include interest at 3% from the date of the injury. If the litigant can show that a higher interest rate is applicable, the Courts have been known to have made such an order.

35. The Jamaican Courts do follow the principle that costs are awarded to the party which is successful. Such costs can be agreed or taxed. To be "Taxed" means that attorneys-at-law prepare proof of why the costs being claimed are to be awarded or alternatively why they should not be awarded and upon hearing the evidence the Taxing Master makes an award. Any such award is as enforceable as a judgment.

36. The system of enforcement to recover judgment sums and costs include issuing a Writ for Seizure & Sale. I attached hereto a copy of a case done many years ago but still good law. It reflects the power of a bailiff to act on a writ and to also secure

his fees. I attach hereto a copy of judgment in *Claim 2009 HCV 03570 Ralston Ferguson v United General Insurance Company / Advantage General Insurance Company* marked **"DSA 6"** for identification.

37. For all these reasons:

    (a) it is my considered opinion, that Jamaica is more than an adequate forum to resolve the dispute between INA KAPLAN and the Defendants.

    (b) It is my considered view that Jamaica has jurisdiction over this Claim given that it occurred on the Island of Jamaica.

    (c) I respectfully opine given that the alleged incident having occurred in Jamaica,

    (d) on the matter of the accessibility and availability of witnesses Jamaica is a proper forum for the matter at bar.

38. I humbly assert that Jamaica does have a judicial system capable of hearing the evidence and making a reasonable award as well as the means of enforcing any judgment so made. I further opine that the Defendant is amenable to process in Jamaica.

39. I hereby declare that the above statements in paragraphs 1 - 39 are true to the best of my knowledge and belief, and I understand that the information is made for use as evidence in Court subject to penalty of perjury under New York law and 28 U.S.C. 1746

**DATED this   23rd    day of  JUNE 2023.**

DANIELLE SHEREEN ARCHER

PARISH OF MANCHESTER] ISLAND
OF JAMAICA        ]

**Danielle S. Archer**
Attorney-at-Law 3967
Notary Public
Jamaica, West Indies

**INA KAPLAN**              CIVIL ACTION NUMBER. 23-cv-2598CBA-RER

      **Plaintiff,**

    **V.**

**HYATT CORPORATION
&
HYATT ZIVA ROSE HALL,**

     Defendants.

———————————/

## EXHIBIT "DSA 1"

This is the extract from the text Negligence *Liability in Caribbean Hospitality and Tourism* written by Gilbert Kodilinye referred to in paragraph 16 of the Declaration of Danielle Shereen Archer dated June 2023.

# NEGLIGENCE LIABILITY IN CARIBBEAN HOSPITALITY AND TOURISM

**GILBERT KODILINYE**

presumptive connecting factor. Club Resorts' [...] activities in Ontario went well beyond [...] a brand and advertising. Its representatives [...] the province on a regular basis and it benefited [...] physical presence of an office in Ontario. It [...] followed that the Ontario court was *prima facie* [...] to assume jurisdiction. Club Resorts had not [...] the presumption of jurisdiction that arose from [...] aforementioned connecting factors, and therefore the [...] court had jurisdiction on the basis of the real and [...] connection test. Furthermore, Club Resorts [...] failed to discharge its burden of showing that a [...] court would clearly be a more appropriate forum [...] the circumstances of this case. In the view of the Court, [...] considerations of fairness to the parties weighed heavily [...] favour of the plaintiffs.

## FORUM SELECTION CLAUSES

It is common for hotels and resorts in the Caribbean to insert a clause in the contract between the hotel and a visitor to the effect that all disputes between the parties shall be (i) adjudicated exclusively by the local courts and (ii) governed by the laws of the local jurisdiction. For example:

'I agree that any claims I may have against the Resort Parties resulting from any events occurring in The Bahamas shall be governed by and construed in accordance with the laws of the Commonwealth of the Bahamas, and further irrevocably agree to the Supreme Court of The Bahamas as the exclusive venue for any such proceedings whatsoever'

INA KAPLAN

       Plaintiff,

   V.

HYATT CORPORATION
&
HYATT ZIVA ROSE HALL,

     Defendants.

_____ /

CIVIL ACTION NUMBER. 23-cv-2598CBA-RER

---

**EXHIBIT "DSA 2"**

---

This is the **_Occupiers' Liability Act_** referred to in paragraph 27 of the Declaration of Danielle Shereen Archer dated　June 2023.

# THE OCCUPIERS' LIABILITY ACT

Act 24 of 1969.

[*1st October, 1969.*]

**1.** This Act may be cited as the Occupiers' Liability Act. Short title.

### *Liability in tort*

**2.**—(1) The rules enacted by sections 3 and 4 shall have effect, in place of the rules of the common law, to regulate the duty which an occupier of premises owes to his visitors in respect of dangers due to the state of the premises or to things done or omitted to be done on them.  Rules of common law altered.

(2) The rules so enacted shall regulate the nature of the duty imposed by law in consequence of a person's occupation or control of premises and of any invitation or permission he gives (or is to be treated as giving) to another to enter or use the premises, but they shall not alter the rules of the common law as to the persons on whom a duty is so imposed or to whom it is owed; and accordingly, for the purpose of the rules so enacted, the persons who are to be treated as an occupier and as his visitors are the same as the persons who would at common law be treated as an occupier and as his invitees or licensees.

(3) The rules so enacted in relation to an occupier of premises and his visitors shall also apply, in like manner and to the same extent as the principles applicable at common law to an occupier of premises and his invitees or licensees would apply, to regulate—

    (a) the obligations of a person occupying or having control over any fixed or moveable structure, including any vessel, vehicle or aircraft; and

(b) the obligations of a person occupying or having control over any premises or structure in respect of damage to property, including property of persons who are not themselves his visitors.

**Extent of occupier's ordinary duty.**

3.—(1) An occupier of premises owes the same duty (in this Act referred to as the "common duty of care") to all his visitors, except in so far as he is free to and does extend, restrict, modify or exclude his duty to any visitor by agreement or otherwise.

(2) The common duty of care is the duty to take such care as in all the circumstances of the case is reasonable to see that the visitor will be reasonably safe in using the premises for the purposes for which he is invited or permitted by the occupier to be there.

(3) The circumstances relevant for the present purpose include the degree of care and of want of care, which would ordinarily be looked for in such a visitor and so, in proper cases, and without prejudice to the generality of the foregoing—

(a) an occupier must be prepared for children to be less careful than adults;

(b) an occupier may expect that a person, in the exercise of his calling, will appreciate and guard against any special risks ordinarily incident to it, so far as the occupier leaves him free to do so.

(4) In determining whether the occupier of premises has discharged the common duty of care to a visitor, regard is to be had to all the circumstances.

(5) Where damage is caused to a visitor by a danger of which he had been warned by the occupier, the warning is not to be treated without more as absolving the occupier from liability, unless in all the circumstances it was enough to enable the visitor to be reasonably safe.

(6) Where damage is caused to a visitor by a danger due to the faulty execution of any work of construction, maintenance or repair by an independent contractor, the occupier is not to be treated without more as answerable for the danger if in all the circumstances he had acted reasonably in entrusting the work to an independent contractor and had taken such steps, if any, as he reasonably ought in order to satisfy himself that the contractor was competent and that the work had been properly done.

(7) The common duty of care does not impose on an occupier any obligation to a visitor in respect of risks willingly accepted as his by the visitor (the question whether a risk was so accepted to be decided on the same principles as in other cases in which one person owes a duty of care to another).

(8) For the purposes of this section, persons who enter premises for any purpose in the exercise of a right conferred by law are to be treated as permitted by the occupier to be there for that purpose, whether they in fact have his permission or not.

**4.**—(1) Where an occupier of premises is bound by contract to permit persons who are strangers to the contract to enter or use the premises, the duty of care which he owes to them as his visitors cannot be restricted or excluded by that contract, but (subject to any provision of the contract to the contrary) shall include the duty to perform his obligations under the contract, whether undertaken for their protection or not, in so far as those obligations go beyond the obligations otherwise involved in that duty. *Effect of contract or occupier's liability to third party.*

(2) A contract shall not by virtue of this section have the effect, unless it expressly so provides, of making an occupier who has taken all reasonable care answerable to strangers to the contract for dangers due to the faulty exe-

cution of any work of construction, maintenance or repair or other like operation by persons other than himself, his servants and persons acting under his direction or control.

(3) In this section "stranger to the contract" means a person not for the time being entitled to the benefit of the contract as a party to it or as the successor by assignment or otherwise of a party to it, and accordingly includes a party to the contract who has ceased to be so entitled.

(4) Where by the terms or conditions governing any tenancy (including a statutory tenancy which does not in law amount to a tenancy) either the landlord or the tenant is bound, though not by contract, to permit persons to enter or use premises of which he is the occupier, this section shall apply as if the tenancy were a contract between the landlord and tenant.

(5) This section, in so far as it prevents the common duty of care from being restricted or excluded, applies to contracts and tenancies created before the commencement of this Act, as well as those entered into or created after its commencement; but, in so far as it enlarges the duty owed by an occupier beyond the common duty of care, it shall have effect only in relation to obligations which are undertaken after the commencement of this Act or which are renewed by agreement (whether express or implied) after its commencement.

Landlord's liability in virtue of obligation to repair.

5.—(1) Where premises are occupied by any person under a tenancy which puts on the landlord an obligation to that person for the maintenance or repair of the premises, the landlord shall owe to all persons who or whose goods may from time to time be lawfully on the premises the same duty, in respect of dangers arising from any default by him in carrying out that obligation, as if he were an occupier of

the premises and those persons or goods were there by his invitation or permission (but without any contract).

(2) Where premises are occupied under a sub-tenancy, subsection (1) shall apply to any landlord of the premises (whether the immediate or a superior landlord) on whom an obligation to the occupier for the maintenance or repair of the premises is put by the sub-tenancy, and for that purpose any obligation to the occupier which the sub-tenancy puts on a mesne landlord of the premises, or is treated by virtue of this provision as putting on a mesne landlord, shall be treated as put by it also on any landlord on whom the mesne landlord's tenancy puts the like obligation towards the mesne landlord.

(3) For the purposes of this section, where premises comprised in a tenancy (whether occupied under that tenancy or under a sub-tenancy) are put to a use not permitted by the tenancy, and the landlord of whom they are held under the tenancy is not debarred by his acquiescence or otherwise from objecting or from enforcing his objection, then no persons or goods whose presence on the premises is due solely to that use of the premises shall be deemed to be lawfully on the premises as regards that landlord or any superior landlord of the premises, whether or not they are lawfully there as regards an inferior landlord.

(4) For the purposes of this section, a landlord shall not be deemed to have made default in carrying out any obligation to the occupier of the premises unless his default is such as to be actionable at the suit of the occupier or, in the case of a superior landlord whose actual obligation is to an inferior landlord, his default in carrying out that obligation is actionable at the suit of the inferior landlord.

(5) Nothing in this section shall relieve a landlord of any duty which he is under apart from this section.

(6) For the purposes of this section, obligations imposed by any enactment in virtue of a tenancy shall be treated as imposed by the tenancy, and "tenancy" includes a statutory tenancy which does not in law amount to a tenancy, and includes also any contract conferring a right of occupation, and "landlord" shall be construed accordingly.

(7) This section applies to tenancies created before the 1st October, 1969, as well as to those created after that date.

## *Liability in contract*

Implied terms in contracts.

6.—(1) Where persons enter or use, or bring or send goods to any premises in exercise of a right conferred by a contract with a person occupying or having control of the premises, the duty he owes them in respect of dangers due to the state of the premises or to things done or omitted to be done on them, in so far as the duty depends on a term to be implied in the contract by reason of its conferring that right, shall be the common duty of care.

(2) The foregoing subsection shall apply to fixed and moveable structures as it applies to premises.

(3) This section does not affect the obligations imposed on a person by or by virtue of any contract for hire of, or for the carriage for reward of persons or goods in, any vehicle, vessel, aircraft or other means of transport, or by virtue of any contract of bailment.

(4) This section does not apply to contracts entered into before the 1st October, 1969.

## *General*

Application to Crown.

7. This Act shall bind the Crown, but as regards the Crown's liability in tort shall not bind the Crown further

than the Crown is made liable in tort by the Crown Proceedings Act, and that Act and in particular section 3 of it shall apply in relation to duties under sections 3 to 5 of this Act as statutory duties.

**INA KAPLAN**                           CIVIL ACTION NUMBER. 23-cv-2598CBA-RER

     **Plaintiff,**

    **V.**

**HYATT CORPORATION**
**&**
**HYATT ZIVA ROSE HALL,**

    Defendants.

_____/

## EXHIBIT "DSA 3"

This is the ***Law Reform (Contributory Negligence) Act*** referred to in paragraph 28 of the Declaration of Danielle Shereen Archer dated June 2023.

## THE LAW REFORM (CONTRIBUTORY NEGLIGENCE) ACT

Cap. 213.

### [*28th December, 1951.*]

**1.** This Act may be cited as the Law Reform (Con- Short title. tributory Negligence) Act.

**2.** In this Act— Interpretation.

"court" means, in relation to any claim, the court or arbitrator by or before whom the claim falls to be determined;

"damage" includes personal injury;

"dependant" means any person for whose benefit an action could be brought under the Fatal Accidents Act;

"fault" means negligence, breach of statutory duty of other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to the defence of contributory negligence.

**3.**—(1) Where any person suffers damage as the result Apportion-partly of his own fault and partly of the fault of any other ment of liability in person or persons, a claim in respect of that damage shall case of con-tributory not be defeated by reason of the fault of the person suffering negligence. the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage:

Provided that—

(a) this subsection shall not operate to defeat any defence arising under a contract;

(b) where any contract or enactment providing for the limitation of liability is applicable to the claim, the amount of damages recoverable by the claimant by virtue of this subsection shall not exceed the maximum limit so applicable.

(2) Where damages are recoverable by any person by virtue of subsection (1) subject to such reduction as is therein mentioned, the court shall find and record the total damages which would have been recoverable if the claimant had not been at fault.

(3) Section 3 of the Law Reform (Tort-Feasors) Act, (which relates to proceedings against, and contribution between, joint and several tort-feasors), shall apply in any case where two or more persons are liable or would, if they had all been sued, be liable by virtue of subsection (1) in respect of the damage suffered by any person.

(4) Where any person dies as the result partly of his own fault and partly of the fault of any other person or persons, and accordingly if such person had not died and an action were brought by him the damages recoverable would be reduced under subsection (1), any damages recoverable in an action brought for the benefit of the dependants of that person under the Fatal Accidents Act, shall be reduced to a proportionate extent.

(5) Where, in any case to which subsection (1) applies, one of the persons at fault avoids liability to any other such person by pleading the Limitation of Actions Act, or any other enactment limiting the time within which proceedings may be taken, he shall not be entitled to recover any damages or contributions from that other person by virtue of the said subsection.

(6) Where any case to which subsection (1) applies is tried with a jury, the jury shall determine the total damages which would have been recoverable if the claimant

had not been at fault and the extent to which those damages are to be reduced.

(7) Article 21 of the Convention contained in the First Schedule of the Carriage by Air Act, 1932 (United Kingdom) as adapted, modified and extended to this Island by the Carriage by Air (Colonies, Protectorates and Mandated Territories) Order, 1934 (which empowers a court to exonerate wholly or partly a carrier who proves that the damage was caused by or contributed to by the negligence of the injured person), shall have effect subject to the provisions of this section. 22 & 23 Geo. 5 c. 36. (U. K.)

4.—(1) This Act shall not apply to any claim to which section 1 of the Maritime Conventions Act, 1911 (United Kingdom) applies and that Act shall have effect as if this Act had not been enacted. Saving for Maritime Conventions Act, 1911, and past cases. 1 & 2 Geo. 5 c. 57. (U. K.)

(2) This Act shall not apply to any case where the acts or omissions giving rise to the claim occurred before the commencement of this Act.

**INA KAPLAN**                                          **CIVIL ACTION NUMBER. 23-cv-2598CBA-RER**

       **Plaintiff,**

    **V.**

**HYATT CORPORATION**
**&**
**HYATT ZIVA ROSE HALL,**

     Defendants.

_____/

## EXHIBIT "DSA 4"

This is a copy of a ***Judgment illustrating how damages are assessed*** in Jamaica referred to in paragraph 32 of the Declaration of Danielle Shereen Archer date   June 2023

SUPREME COURT LIBRARY
KINGSTON
JAMAICA *Judgment Book*

IN THE SUPREME COURT OF JUDICATURE OF JAMAICA

IN COMMON LAW

CLAIM NO. 2005 HCV 294

| BETWEEN | ICILDA | OSBOURNE | CLAIMANT |
| AND | GEORGE | BARNED | FIRST DEFENDANT |
| AND | METROPOLITAN MANAGEMENT | | |
| | TRANSPORT HOLDINGS LTD | | SECOND DEFENDANT |
| AND | OWEN | CLARKE | THIRD DEFENDANT |

Miss Marion Rose-Green instructed by Marion Rose-Green and Company for the claimant

Mr. Manley Nicholson instructed by Nicholson Phillips for the first defendant

February 2 and 17, 2006

ASSESSMENT OF DAMAGES, PERSONAL INJURY, LOSS OF EARNING CAPACITY, LOSS OF FUTURE EARNINGS, COST OF FUTURE ASSISTANCE

SYKES J

1. The claimant is now 60 years old. She was a practical nurse employed to Hopefield Home for the Aged located at 9 Hopefield Avenue. Her career was cut short because of injuries she suffered while traveling in a bus driven by Mr. Owen Clarke, the third defendant, who was, at the material time, the servant or agent of Metropolitan Management Transport Holding Limited, the second defendant, which owned the bus. Mr. George Barned, the first

defendant, owned and drove the other motor vehicle involved in the accident. Judgment was entered against the first defendant alone. This judgment is concerned solely with assessment of damages.

2. The accident to which I referred earlier occurred on October 12, 2002. Miss Osborne was sitting in a seat at the front of the bus when it collided with Mr. Barned's vehicle. The accident occurred on Molynes Road. The force of the impact ejected her from the seat and she fell, striking her back, against a bar inside the bus. She also injured her right knee with the result that it became cut and swollen.

## THE ASSESSMENT

3. I should state at the outset that there are broad principles that must be taken into account when assessing personal injury claims. One is that while there ought to be consistency in personal injury awards in a particular jurisdiction, this must not outweigh the fact that the court is not compensating an abstract claimant but the one before the court. I fear that some of the submissions of Mr. Nicholson have not paid sufficient regard to this principle. This is not to say that compensating the particular claimant means that the court ignores similar awards. I am guided by this statement of principle enunciated by Lord Morris in *H. West & Sons Ltd v Shephard* [1963] 2 All ER 625 at page 633 D – G

> The first of these questions may be largely answered if it is remembered that damages are designed to compensate for such results as have actually been caused. If someone has been caused pain then damages to compensate for the enduring of it may be awarded.... Apart from actual physical pain it may often be that some physical injury causes distress or fear or anxiety. If, for example, injuries include the loss of a leg there may be much physical suffering, there will be the actual loss of the leg (a loss the gravity of which will depend upon the particular circumstances of the particular case) and there may be (depending upon particular circumstances) elements of

2

> consequential worry and anxiety. One part of the
> affliction (again depending upon particular circumstances)
> may be an inevitable and constant awareness of the
> deprivations which the loss of the leg entails. These are
> all matters which judges take into account. In this
> connection also the length of the period of life during
> which the deprivations will continue will be a relevant
> factor (see Rose v. Ford).

Lord Devlin spoke in a similar vane at page 636 E

> [T]here is compensation for pain and suffering both
> physical and mental. This is at large. It is compensation for
> pain and suffering actually experienced.

**4.** The principles derived from these passages are that assessment
of damages in personal injury cases has objective and subjective
elements which must be taken into account. The actual injury
suffered is the objective part of the assessment. The awareness of
the claimant and the knowledge that he or she will live with this
injury for quite some time is part of the subjective portion of the
assessment. In the case before me, Miss Osbourne will be aware of
her back injury. As I will expand on later, the doctor says that
activities of daily living will aggravate her injury. In short, the
injuries suffered and awareness of them, in this case, are life long.
For this, she must be compensated. The interaction between the
subjective and the objective elements in light of other awards for
similar injuries determines the actual award made to a particular
claimant before the court. I now turn to an analysis of the evidence.

**The nature and extent of injuries sustained**

**5.** As stated earlier the claimant fell and hit her back on a metal bar
in the bus and also cut her knee.

**Medical report of Dr. Paul Robinson**

He reports that he saw the claimant on October 12, 2002 and she
was found to be suffering from

a. whiplash injury;

b. tenderness to the posterior aspect of the neck; and

c. painful swelling of the lower back.

He prescribed analgesics and muscle relaxants and sent her home for fourteen days. I pause here to observe that there is no evidence that Dr. Robinson was an orthopaedic specialist. It appears that no one realised the seriousness of the injury until much later when Miss Osbourne returned to work.

## Medical report of Mr. R. C. Rose, Consultant Orthopaedic Surgeon

It is convenient that I deal with a submission made by Mr. Nicholson in relation to the credibility of the claimant. Mr. Nicholson submitted that between October 2002 when the claimant was seen by Dr. Robinson and March 31, 2005 when she was seen by Mr. Rose, there is no evidence that Miss Osbourne was seen by any doctor. This gap, submitted Mr. Nicholson, casts grave doubt on whether the injuries complained of in this assessment were really caused by the accident of October 12, 2002. If, Mr. Nicholson continued, the claimant was really in pain, why didn't she seek medical treatment for over two years? How can we be sure that the injuries flowed directly from the accident?

I do not accept this submission. First, the claimant has said that she did not have much money to attend doctors and when she tried the public hospital system the waiting time overwhelmed her and so she left. She added that she was being assisted financially by her son and daughter in law. Being the proud woman that she is she did not wish to become a permanent charge on their generosity so she bore her pain with great stoicism. However, when the pain became even more intense she decided to "take it in hand". Second, the medical examination

4

undertaken by Mr. Rose establishes that there is a causal connection between the injuries and the accident. As Lord Reid indicated in *H. West & Sons* a brave man who makes light of his disabilities ought not to receive less compensation on account of that (see page 628E).

An examination of Mr. Rose's report reveals that he knew that he was examining a patient in 2005 who alleged that the maladies from which she is now suffering arose from an accident in October 2002. The opening paragraph and history recorded from Miss Osbourne makes this clear. Mr. Rose also enquired about her past medical history. Thus based upon the evidence before the doctor he could not be under any mistaken view of what he was being asked to do. He was indeed being asked to say whether there was a causal connection between the injuries and the accident. The doctor carried out a physical examination of the patient which was supported by radiographs. After this the doctor concluded that Miss Osbourne suffered from chronic mechanical lower back pains and chronic cervical strain. I repeat his prognosis verbatim

> *Ms Osbourne will be plagued by intermittent lower back and neck pains and these will be aggravated by activities of daily living which involves sitting, bending, lifting and sudden movements of the neck.*

This grim assessment came after he made the diagnoses of chronic mechanical lower back pains and chronic cervical strain.

I now quote from the section of the report captioned *disability rating*

> *Her permanent partial disability as it related to the lumbo-sacral spine is five percent of the whole person. The permanent partial percentage disability as it relates to the cervical spine is also five percent of the whole person. **Her***

> ***total partial percentage disability is ten percent of
> the whole person*** *(sic).*

I now quote from the report his findings on physical examination.

> *Examination of the cervical spine revealed mild tenderness
> on palpation of the sternocleidomastoid muscles. The
> following are the ranges of motion of the cervical spine:
> extension 20º, forward flexion 25º, right and left lateral
> rotation 35º bilaterally. The neurovascular status was intact
> in both upper extremities.*
> *Examination of the lumbo-sacral spine revealed mild
> tenderness on palpation of the midline of the lower lumbar
> spine. There was no spasm of the erector spinae muscles.
> The neurovascular status was intact in both lower
> extremities. Straight leg raising was 75ºbilaterally with
> onset of lower back pains.*

The radiographs showed increased lumbar lordosis with mild spondylolistesis at L4 – L5 level. There was also sclerosis of the pedicles bilaterally at the L4 – L5 level. There was sclerosis of the upper part of the body of T12 with anterior body osteophytes.

There is nothing in the report that would suggest that the doctor failed to give satisfactory consideration of the causal link between the accident in October 2002 and his examination in May 2005. Mr. Nicholson has not raised the issue of the competence of the doctor and neither has he suggested that the claimant's injuries have come from any other source but the accident. It means then that there is no proper evidential basis for me not to accept that the findings of Mr. Rose cannot be linked causally to the accident. The absence of visits to the doctor cannot, without more, deflect the conclusion that the accident caused the injuries seen in 2005.

## The gravity and extent of resulting physical disability

6. In my view what the medical report of Mr. Rose shows is severe impairment of the claimant. The 35° right and left bilateral rotation

6

means that the side to side movement of her head is greatly reduced. Her chin does not reach around to her shoulder which would be approximately 90° from looking straight ahead. The extension of only 20° means that she has great difficulty looking upwards. Similarly, the 25° forward flexion means that she is restricted in her ability to look down at her feet.

When the doctor said that the neurovascular status was intact he was seeking to determine whether the pain she experienced and still experiences were attributable to damage to the nervous system. This has been ruled out and so he concluded that it was the actions (mechanical) of sitting, bending and so on, which did and would aggravate her back. The L4 – L5 level is quite low down in the lower back. T 12 refers to the cervical area of the spine.

Miss Osbourne's evidence is that she returned to work after the two weeks of initial rest recommended by Dr. Robinson. She did not last a week before she was off again. Her work as a practical nurse involves lifting of patients and objects. This involves a lot of bending. Her back pained her and she was given a further two weeks off. She returned to work after this second period of two weeks with the same result. Her employers told her that she could not "manage the work anymore" and so her services were terminated. According to her, since the injury she has to employ a household helper. Apparently, she had one before but since the accident the helper is now a necessity. She tried to find employment in January 2006, but her back forced her to give up the job. The injury has affected her ability to cook, wash and other household activity.

In light of Mr. Rose's report, this inability to use her back is not surprising. Daily activities will aggravate the injury. To put it another way, the claimant does not have to engage in any unusual activity before her back is aggravated. If this is so, then future work is well

nigh impossible. Who is going to employ a 60 year old woman with chronic back and neck pains which can be brought on by ordinary activity? On this evidence alone her ability to compete on the open labour market with other 60 year olds has diminished to say nothing of competing with able bodied youngsters.

### The pain, suffering endured, and loss of amenity

**7.** Miss Osbourne's pain has been continuous and aggravated by ordinary activity. Just this fact alone means that her enjoyment of life has decreased considerably. A body free of chronic mechanical lower back pain and free of chronic cervical strain is a thing of temporal value. She has a legal right not to have this state of affairs altered by the tortious act of another. As Lord Roche so eloquently stated, "*I regard impaired health and vitality not merely as a cause of pain and suffering but as a loss of a good thing in itself*" (see **Rose v Ford** [1937] A.C. 826, 859). The tortfeasor must compensate her for this.

**8.** The claimant used to be able to walk around free from pain and free from the fear of the onset of pain. Even though she had employed a helper before the injuries she could perform her household chores. She could have dispensed with the services of a helper if necessary but now she must have one.

**9.** Her evidence is that before the accident she used to work, attend church and purchase her supplies at the market. These pleasures she no longer enjoys because of the injury. Even driving in a motor vehicle is uncomfortable. She is constantly on pain medication. There is no doubt that her life has changed irrevocably.

### The effect on pecuniary prospects
### Loss of earning capacity

**10.** One of the issues that has arisen in this case is the question of whether there should be an award for loss of earning capacity and if

8

yes, how should it be computed. I have come to the conclusion that the law as it presently stands in Jamaica does not prohibit an award under this head of damages if the person is unemployed at the time of the trial. This conclusion is not new. Courtney Orr J came to the same conclusion in the lamentably uncelebrated case of *Mark Scott v Jamaica Pre-Pack Ltd* Suit No. C. L. S 279 of 1992 (delivered October 26, 1993). His Lordship rested his decision on the judgment of Browne L.J. in *Cook v Consolidated Fisheries Ltd* (The Times, January 17, 1977). This citation of *Cook* is from the judgment of Orr J. Orr J did not have the benefit of the full transcript of the *Cook* case. Despite this he correctly discerned that Browne L.J. had decided that an award can be made under this head even if the person is unemployed at the date of trial.

**11.** It is my view that when one traces the history of the matter, the Court of Appeal of Jamaica must have come to the same conclusion despite the suggestion by some that the Court did no such thing. I now demonstrate why I have formed this view. *Gravesandy v Moore* (1986) 40 WIR 222 approved and applied *Moeliker v Reyrolle & Company Ltd* [1977] 1 All ER 9. After citing the head note of *Moeliker* Carey J.A. said that "*the claim for loss of earning capacity is more likely than not to arise in cases where the plaintiff is in employment at the time of trial or assessment*" (see page 224) (my emphasis). It is to be noted that Carey J.A. never said that loss of earning capacity **only** arises if the claimant was working at the time of the trial. No judgment from the Court of Appeal since *Gravesandy* has doubted or modified the way in which Carey J.A. expressed the principle. This is so even taking into account the phraseology of Harrison P (Ag) (as he was at the time in *Dawnett Walker v Hensley Pink* SCCA NO 158/01 (delivered June 12, 2003). At pages 35 – 36, Harrison P dealt with the question of loss of earning capacity. He cited *Moellker* but not *Gravesandy*.

The passage extracted by Harrison P (Ag) from *Moeliker* referred to the two stage test. At stage one the question is whether there is any evidence of risk that the claimant will lose his job. If the answer is yes then at stage two, the issue is quantifying that risk. It is obvious that framing the issue in this way is predicated on the claimant working at the time of the trial. Even so, Harrison P (Ag) never said that a necessary precondition of the award is that the claimant had to be working at the time of trial. In the case before him the claimant was working at the time of trial, so there was no need for him to formulate the test in any other way. The plain fact of the matter is that to date our appellate court, as far as reported and available unreported decisions go, have not had to deal with the a case in which the claimant was unemployed at the time of the trial.

12. There is a difference between the report of *Moeliker's* case in the All England Reports and the Weekly Law Reports on the one hand and the Industrial Court Reports on the other. *Moeliker* was first published at [1976] I.C.R. 253. The version of *Moeliker* found at [1976] I.C.R. 253 has these words at page 262

> This head of damage **only** arises where a plaintiff is at the time of the trial in employment, but there is a risk that he may lose this employment at some time in the future, and may then, as a result of his injury, be at a disadvantage in getting another job or an equally well paid job.(my emphasis)

His Lordship says later on the same page 262
> As I have said, this problem **only** arises in cases where a plaintiff is in employment at the date of the trial. (my emphasis).

13. The word **only** does not appear in the version reported in the All England Reports and the Weekly Law Reports. It was replaced by **generally** (see *Moeliker* at [1977] 1 All ER 9, 15b, f and [1977] 1 W.L.R. 132, 141G). This emendation came about because Browne L.

J. corrected the proof presented to him for publication in the All England Report and changed *only* to *generally*. Let him speak for himself. In *Cook v Consolidated Fisheries Ltd* at page 640 he said firstly

> I agree that this appeal should be allowed and the figure increased from £500 to £1,500 for the reasons given by Lord Denning M.R. I only add anything because I was a party to the decisions in Moeliker and Nicholls to which Lord Denning M.R. has referred, and this gives me a chance of correcting something which I now think is wrong which I said in Moeliker's case.

Then he at pages 640 - 641 these vital passages appear

> This case differs in one respect on the facts from any of the three previous cases cited. In all those cases the plaintiff was in fact in work at the date of the trial. In fact, in all the cases he was still in the employment of his pre-accident employer. This case is different because at the date of the trial the plaintiff was not in work at all, although his previous employer would have been willing to employ him and he could have continued to work as a deckhand if he had ignored (sic) the advice of his doctor.
>
> In my view, it does not make any difference in the circumstances of this case that the plaintiff was not actually in work at the time of the trial. The trial judge said: "Looking ahead as best I can with the information before me, I expect that [the plaintiff] will obtain employment pretty well immediately." The judge turned out to be quite right, because he did. **In Moeliker's case at p. 261 of the report in [1976] I.C.R. 253, I said: "This head of damage only arises where a plaintiff is at the time of the trial in employment." On second thoughts, I realise that is wrong. That was what I said, but on second thoughts I realised that was wrong; and, when I came to correct the proof in the report in the All England Reports, I altered the word "only" to "generally," and that appears at [1977] 1 All E.R. 9, 15.**
> (my emphasis)

**14.** Thus the version of the *Moeliker* case approved by Carey J.A. in *Gravesandy* was indeed the corrected version. This should now put to rest the proposition that an award for loss of earning capacity can **only** be made if the claimant is working at the time of the trial. It is significant to note as well that in *Cooke's* case, the trial judge

found that although the claimant was almost sure to find immediate employment his earning capacity was reduced because in 10 – 15 years the injury would provoke the early onset of osteoarthritis. The award for loss of earning capacity was not only upheld but increased from an already substantial figure of £500 but increased to £1500. This emphasises the point that awards for loss of future earning capacity for that is really what the award is in appropriate cases must be substantial.

15. In the case before me, the evidence is that Miss Osbourne has lost her job because she could no longer carry out the duties and responsibilities of a practical nurse. Her employers told her that that was the reason for not continuing her employment. So the risk materialised within six weeks of the accident. She is handicapped. Ordinary activities are painful.

16. Her work history is that she worked at other nursing homes for three years before going to Hopefield where she worked for four years. Before her stint in the care industry she did, in her words "general work". I understood this to mean odd jobs including household chores such as cooking, washing and cleaning.

17. She went out to seek work after two years, at a nursing home on Old Harbour Road, Spanish Town, St. Catherine but her back would not allow her to continue. This was in January 2006. She successfully negotiated the interview but the physical effort required to lift the patients got the better of her. She admits that she did not attempt to work before January 2006, because of the pain in her back. At the time of the accident she was 57 years old with approximately eight years left to work assuming she retired at age 65. She said that she graduated from sixth form but when questioned further it turned out that her educational attainments did not equip her for jobs far removed from manual work. What is clear is that she can no longer work at jobs that require much lifting,

bending or sitting. She can no longer work as a practical nurse or even a household helper. She testified that even when she stands for long periods she experiences much discomfort. Miss Osbourne testified that although she has the skills of a seamstress she cannot utilise them because she suffers pain in her neck and back. If she sits up for long periods, she says, pain comes along. I am satisfied that Miss Osbourne should receive an award for loss of future earning capacity.

18. The remaining issue is the method of calculation. The Court of Appeal has indicated that there are three methods of calculating this award (see Gordon J.A. in *George Edwards v Dovan Pommells* SCCA 38/90 (delivered March 22, 1991)). These are (a) the multiplier/multiplicand method; (b) the lump sum method or (c) increasing the award for pain, suffering and loss of amenities to include an unspecified sum for loss of earning capacity. It would seem to me that with the increasing trend towards itemising each head of damages the third method identified by the Court of Appeal ought not to be applied very often if at all. One of the reasons for itemising the award under each head is that it makes it easier for litigants and appellate courts to determine whether a particular award is satisfactory in the event of a challenge (see *August v Neptune* (1997) 56 W.I.R. 229).The cases suggest that the choice of method is influenced by the information available to the court, that is to say, where the claimant has been working for some time before the accident so that the court has some reliable data concerning her income, her remaining working life and so on then the multiplier/multiplicand method may be used (*Campbell v Whylie* (1999) 59 WIR 326).

19. Another reason why the third method identified by the Court of Appeal may not prove appropriate is that there is the danger that the award under this head may be compressed by the fact of an

award for pain and suffering. The English Court of Appeal has suggested, a suggestion that I unreservedly adopt, that the award for loss of future earning capacity should be separately assessed and not affected or reduced by the sum awarded as general damages. I intend to make a substantial award for loss of future earning capacity and for that reason I set out, at the risk of lengthening an already long judgment, the full passage from judgment of Lord Denning M.R. in *Cooke* at pages 639 – 640:

> *In this case Lane J. awarded him for general damages -- pain, suffering and loss of amenities -- the sum of £3,000. For the loss of future earning capacity she awarded £500. There is an appeal to this court on the ground that the item of £500 was much too small. The judge thought that £3,500 was the right total but as to the items she said:*
>
> > *"Were I to make a larger award than I have in mind for loss of earning capacity, I should probably have been slightly less generous with the pain and suffering part of my award."*
>
> *In other words, she said: "I'm aiming at £3,500 altogether. I think my £3,000 might be on the generous side for the pain and suffering and my £500 on the low side for loss of earning capacity but, together, £3,500 is about right."*
>
> *I think we should consider the two items separately. The sum of £3,000 for pain, suffering and loss of amenities may have been on the generous side, but there is not any appealable error in it. It may be on the top line of the bracket (the bracket may be between £2,500 and £3,000) but it is not an appealable excess. So the £3,000 must stand.*
>
> *The other item of £500 must also be considered on its own merits. The law on ""loss of earning capacity" has been developed in three cases in the last two or three years: see <u>Smith v. Manchester Corporation (1974) 17 K.I.R. 1</u>; then two cases in which Browne L.J. gave reserved judgments: <u>Moeliker v. A. Reyrolle & Co. Ltd. [1976] I.C.R. 253</u> and <u>Nicholls v. National Coal Board [1976] I.C.R. 266</u>. In Moeliker's case Browne L.J. said, at p. 262:*
>
> > *"Where a plaintiff is in work at the date of the trial," -- and this case is comparable -- "the first question on this head of damage is: what is the risk that he will at some time before the end of his working life lose that job and be thrown on the labour market? I think the question is whether this is a ' substantial' risk or is it a 'speculative' or 'fanciful' risk ... But if the court decides that there is a risk which is 'substantial' or 'real,' the court has somehow to assess this risk and quantify it in damages."*
>
> *There is no doubt in this case that the risk is substantial. In 15 or 20 years' time this man, because of the state of his arm, may be unable to do his work and may be out of employment or at less well paid employment. It will be some years before the end of his working life because he will then only be in his middle forties.*
>
> *The question then is how to quantify now the amount of the loss which will not occur until many years ahead. We were told that if £500 is invested now, in 20 years' time at 10 per cent., it would increase to £5,000 or something of that order.*

*That is a warning not to give big sums on this head. The compensation has to be the present value.*

*In the previous cases the injured men were in their forties. In Smith's case the figure was increased from £300 to £1,000. In Moeliker's case the sum of £ 750 was not disturbed because there was a very good chance that the man would keep his employment and would not lose it. In Nicholls' case £2,000 was given to a man in his late forties.*

*Looking at the whole circumstances of this·case and remembering that £3,000 is on the generous side for the pain, suffering and loss of amenities, there is no reason why this figure should be generous. It seems to me that £500 was too low. A better figure would be £1,500. I would allow the appeal accordingly and increase it to £1,500.*

**20.** Browne L.J. agreed expressly with the analysis and reasons of the Master of the Rolls. Sir John Pennycuik, the other member of the court, agreed with the judgments of the Master of the Rolls and Browne L.J.

**21.** This leaves me with two methods. Unfortunately the case law both here in the West Indies and England does not provide much help in determining which method is used. ***Campbell's*** case comes closest to suggesting a criterion, namely, the type of information about the claimant that is available to the court. It seems to me that the matter has to be resolved by taking in to account that the aim of assessment is adequate compensation and not over compensation. What this means is that it is permissible for the judge to use the two methods and then look at it in the context of the global award on general damages to see if the total figure on general damages is appropriate for the harm suffered. The impact of special damages is ignored because the claimant must recover these once they are properly proved. I should make it clear that for the purposes of this discussion general damages excludes loss of future earnings and cost of future assistance, medical care and such like. Although they are not losses incurred before trial and so would not fall within special damages, as the expression is commonly understood, these damages are quantifiable future losses that are independent of any award for pain and suffering. Thus if these awards are in fact

substantial that cannot serve to depress the award for pain, suffering and loss of amenity and neither should they serve to depress the award for loss of future earning capacity because loss of future earning capacity is an actual loss in itself that occurs regardless of whether the claimant can recover any other award for general damages. These are my considerations that have guided this aspect of the award in this case.

22. In this case an award for loss of future earnings will be made. I will therefore award a lump sum but as a differentiated figure from pain, suffering and loss of amenities. I award a sum of $500,000 for loss of earning capacity.

## Loss of future earnings

23. It is well established that loss of future earnings is an item of general damages and is separate from loss of earning capacity (see Carey J.A. in *Gravesandy v Moore*). There is no principle of law that says that both cannot be recovered in an appropriate case. It is instructive to note that the Court of Appeal of England upheld an award of loss of earning capacity, loss of future earnings and loss of pre trial earnings in *Zielinski v West* [1977] C.L.Y. 798.

24. From the evidence before me but for the accident the claimant would quite likely have worked to at least age 65. Her injuries will prevent her from working again. The claimant has no history of any chronic illness that might have shortened her working life, that is to say, she had no history of asthma, diabetes, hypertension, allergies or known cardiac problems. She is now for all practical purposes a retiree. The evidence before the court, which has been accepted by the defendant, is that the claimant received the net figure of $15,000 per month. She said that her statutory deductions and taxes were calculated and withheld by her employers. This evidence was not challenged. The multiplicand works out to $180,000 per year. I

take into account that a lump sum is being awarded to the claimant. It is well known that persons in these jobs work beyond age 65 up to 70 years old. However, I will assume that she would have retired at age 65. In looking at Khan's volume 5 there is a list of multipliers for claimants of different ages. I believe that an appropriate multiplier, having regard to the uncertainties of the future is 3. This produces an award of $540,000.

### Loss of pre-trial earnings

**25.** Miss Osbourne has claimed net loss of income from November 1, 2002 to October 28, 2005 at $15,000 per month. The evidence is that the accident occurred on October 12, 2002. She was off for two weeks, returned, off for two weeks, returned and then her services were terminated. Her evidence is that she was not paid for the whole month of October 2002 because her employers told her that she could not work, meaning, she was not performing satisfactorily after the accident. This she was told on her return after the first two-week break that immediately followed the accident. The amount claimed, proved and therefore awarded is $536,250.

### Cost of future assistance

**26.** I accept the overall evidence in this case that the claimant will need assistance for the rest of her life. She says that since December 2005, she is assisted every day. There is no evidence of the weekly salary of the assistant. The evidence spoke to a maximum of $1000 per day one day per week. I therefore make an award of $1000 one day per week. This produces a figure of $4000 monthly and $48,000 per year. Life expectancy of women in Jamaica is said to be approximately 72 years. I shall use a multiplier of 8. The figure is $384,000.

## Damages for pain, suffering and loss of amenity

27. A number of cases was cited by both attorneys. The ones I have selected are the ones of greatest assistance. In *Candy Naggie v The Ritz Carlton Hotel Company Jamaica Ltd* Claim No. HCV 00503 of 2004 Sinclair-Haynes J (Ag) awarded the sum of. $1,750,000 for pain, suffering and loss of amenity. The assessment was done on December 13, 2005. The injuries of Miss Naggie arose from a fall at her work place. She experienced sudden severe lower back pains. The medical evidence showed that the lower back pains were precipitated by standing and bending. Miss Naggie had no chronic diseases. The prognosis was similar to that of Miss Osborne, namely that the lower back pains will be aggravated by activities of daily living such as prolonged sitting, standing, bending and attempting to lift objects. The difference between the two is this: whereas Miss Naggie's pains were brought on by **prolonged sitting, standing, bending** Miss Osbourne's lower back pains are aggravated just by sitting, bending or lifting. Additionally, Miss Osbourne has neck pains while Miss Naggie had none. Miss Naggie had a ten percent disability of the whole person. I should add that the hearing before Sinclair-Haynes J (Ag) both sides were represented.

28. There is another assessment of Sinclair-Haynes J (Ag) done on April 8, 2005, in the matter of *Dawn Vernon v Paulnor Sea Port Company Limited* HCV 2282 of 2003. The sum of $1,900,000 was awarded for pain, suffering and loss of amenities. Ms Vernon had mild mechanical lower back pains and whiplash injury. The prognosis was that she would have intermittent neck pains and mild lower back pains which would be precipitated by activities of daily living such as doing household chores, driving and **prolonged sitting** and **walking.** There was a ten percent permanent partial disability of the whole person.

18

**29.** The cases above were cited by Miss Rose-Green. I should point that the cases relied on by Miss Rose-Green are not reported in either *Harrison's* or *Khan's*. I was provided with copies of the final judgments and medical reports. Of the cases relied on by Mr. Nicholson the most helpful was that of *Merlene Nelson v Edgar Cousins* Suit NO. C. L. N 078 of 1986 (assessed between December 16, 1991 and November 29, 1996) reported at *Khan's Volume 5 at page 162*. The claimant suffered neck and back injuries. She complained of pains down her right shoulder. There was tenderness over the lower cervical and mid dorsal region of the spine as well as cervical spondylosis C3 − 6 but no abnormality in the dorsal spine. She was assessed at not having more than ten percent permanent partial disability. The general damages there were $525,000. The most recent CPI is December 2005 (2293.8). The CPI at the time of the assessment was 1006.9. The current value of the award is $1,195,922.65.

**30.** Mr. Nicholson submitted that an appropriate award was $1,000,000. I don't agree. The injuries received by Miss Osbourne while similar to the those in the *Nelson* case there is nothing in the report to indicate that Miss Nelson had the prolonged suffering, physical and mental, that Miss Osbourne has experienced, is experiencing and will continue to experience. In the *Dawn Vernon* case the injuries to the back were described by the doctor as mild whereas Miss Osbourne's is chronic. I have already noted the differences between *Naggie's* case and Miss Osbourne. It seems to me that an appropriate award is $2,500,000.

**Special damages**

**31.** Both counsel agreed items 3 − 5 of the claim for special damages. These are transportation ($1600), visit, consultation and medical report of Mr. Rose ($12,000) and transportation to and from Mr.

Rose ($600).

**32.** The other items were not agreed and so will have to be assessed. There is also a claim for $22,350 for medical expenses, visits to doctors and medication. The evidence is not the best but she testified that she paid Dr. Robinson $1500 for the report and $2,000 for the visit to him. No receipts were tendered but there is no challenge that she did these things. The amounts indicated are reasonable and therefore recoverable. She also went to a Dr. Chin. She paid him $3,000 for the visit. She received a prescription from him that cost $1500. This is also recoverable.

**33.** Miss Osbourne said that her daughter in law employed a lady to assist her at the rate of $800 per day. The lady came one day per week. The first period is from October 13, 2002 to December 31, 2002. This is a period of twelve weeks which makes the sum $9,600. This is recoverable. The second period of fifty two weeks from January 5, 2003 to December 31, 2003. The amount pleaded for this period was at $900 per day. The evidence speaks to $1000. The sum recoverable is fifty two weeks at $900 per week. This is $46,800. The third period is from January 4, 2004 to October 28, 2005. The sum claimed is $109,200 at $1200 per day. There is no evidence that $1200 were paid for this assistance. Thus the sum recoverable is at the rate of $1000 per day, one day per week for 91 weeks which is $91,000.

**Conclusion**

**34.** My award is as follows

    a. General damages

        i. Pain, suffering and loss of amenities - $2,500,000 at six percent interest from June 4, 2005, to February 17, 2006;

        ii. Loss of earning capacity - $500,000 – no interest;

        iii. Loss of future earnings - $540,000 – no interest;

iv. Cost of future assistance - $384,000 – no interest;

b. Special damages

i. Pre – trial loss of earnings - $536,250;

ii. Medicines, medical reports and visits to doctors, transportation - $22,200;

iii. Pre-trial cost of assistance - $147,400;

iv. The total special damages of $705,850 attract interest at the rate of six percent from October 12, 2002 to February 17, 2006.

Costs to the claimant agreed at $52,000.

**INA KAPLAN**

      **Plaintiff,**

    **V.**

**HYATT CORPORATION
&
HYATT ZIVA ROSE HALL,**

    Defendants.

_____/

**CIVIL ACTION NUMBER. 23-cv-2598CBA-RER**

---

**EXHIBIT "DSA 5"**

---

This is the ***PRACTICE DIRECTION 19/2021 Short Notice List*** referred to in paragraph 32 of the Declaration of Danielle Shereen Archer dated  June 2023.

## PRACTICE DIRECTION NO 19 OF 2021

## SHORT NOTICE LIST

This Practice Direction supersedes Practice Direction dated March 19, 1996 and will come into effect on September 16, 2021.

1 . There shall be a Short Notice List comprising civil cases in which parties require no more than twenty-four (24) hours notification to be ready for trial.

2. Cases on the Short Notice List must meet the following criteria:

(i) either there are no, or few, witnesses other than the parties, and any witness can be easily contacted; and

(ii) the case is estimated to last one (1) or two (2) days only, and the order made at the case management conference so states; and

(iii) the case is to be tried by a Judge alone.

3. At the case management conference, in addition to setting a trial date for a matter, the Master-in-Chambers or Judge shall inquire if it should also be placed on the Short Notice List, and if so shall set it down accordingly.

4. The attorneys-at-law for all parties to an action, and litigants-in-person where applicable, may in writing, jointly request that the Registrar set down an action on the Short Notice List, after the case management conference.

5. The provision in paragraph four (4) shall apply to matters in which a case management conference was held prior to the date of this Practice Direction, but which meet the criteria set out in paragraph one (1) above.

6. A Short Notice List shall be published on the Supreme Court's website on the first Monday of each month and the cases shall be listed

according to the date on which the Order was made at the case management conference or, in respect of paragraph four (4), the date on which the formal request from counsel was received.

7. Cases appearing on the Short Notice List shall come on for hearing in the order in which they are listed, subject to their compliance with the orders made at the case management conference.

8. Notification of the availability of a trial date for a matter on the Short Notice List shall be communicated by a telephone call confirmed by electronic mail to Counsel from the Registrar. Failure of the attorneys-at-law for all the parties to an action, and litigants in-person where applicable, to confirm acceptance of the trial date with the Registrar

within an hour of the notification will result in withdrawal of the date offered and the matter will retain its position on the list.

**Dated the 15th  day of September 2021**

**Bryan Sykes OJ, CD**
**Chief Justice**

INA KAPLAN

       Plaintiff,

    **V.**

**HYATT CORPORATION
&
HYATT ZIVA ROSE HALL,**

    Defendants.

_____/

CIVIL ACTION NUMBER. 23-cv-2598CBA-RER

---

### EXHIBIT "DSA 6"

---

This is the ***Judgment recognizing the authority of the Bailiff*** referred to in paragraph 36 of the Declaration of Danielle Shereen Archer dated June 2023.



IN THE SUPREME COURT OF JUDICATURE OF JAMAICA
IN CIVIL DIVISION
CLAIM NO 2009 HCV 03570

| | | |
|---|---|---|
| BETWEEN | RALSTON THOMAS | CLAIMANT |
| AND | UNITED GENERAL INSURANCE COMPANY LIMITED/ ADVANTAGE GENERAL INSURANCE COMPANY LIMITED | DEFENDANT |

Miss Danielle Archer for the Claimant

Mr. Michael Hylton Q.C. and Mr. Kevin Powell instructed by Michael Hylton and Associates for the Defendant

**Civil Practice – Application for Summary Judgment – Defendant countermanding cheques drawn in favour of Claimant – Subsequently paying the sum due - Claim for fraud – Whether cause of action still subsisting – Whether loss resulting from the defendant's conduct – CPR rule 15.2**

**BROOKS, J.**

## 2nd and 22nd March, 2010

United General Insurance Company Limited/Advantage General Insurance Company Limited on July 3, 2009, had an unwelcome visitor. He was Mr. Ralston Thomas, the bailiff for the parish of Saint Catherine. The purpose of Mr. Thomas' visit was to execute a Writ of Seizure and Sale issued by this court against the company.

The company responded, no doubt, to save the embarrassment. It presented Mr. Thomas with two cheques, each one in the sum of $3,804,984.30; totalling $7,609,968.60. The sums were to settle a judgment

debt and Mr. Thomas' bailiff's fees. A covering letter issued by the company explained the payments. Mr. Thomas was the payee named on the cheques. Satisfied, Mr. Thomas left the premises.

He lodged the cheques to his account. On July 8, 2009 the cheques were dishonoured. Mr. Thomas acted swiftly. He immediately filed this claim alleging fraud, seeking damages for recovery of his fees and for fraud. The Claim Form was served on the company on July 9, 2009.

The company issued a new cheque to him in the sum of $7,547,783.87 on or about July 28, 2009. This latter cheque was honoured and a further payment made in settlement of his claimed fees, but Mr. Thomas is not satisfied. He wishes to pursue his claim for damages for what he perceives as deceitful conduct by the company.

The company has not filed a defence but now applies for summary judgment on the basis that Mr. Thomas' claim has no real prospect of success. With the issue of the bailiff's fees having been resolved, two main issues arise for determination:

    a.    does a claim for fraud stand any real prospect of success, and

    b.    does Mr. Thomas' claim demonstrate that he has suffered loss?

## Additional Facts

It is important to note, before dealing with the law, that the company has supported its present application with an affidavit sworn to by Ms. Odia S. Reid on October 5, 2009. This affidavit exhibits an order of this court, made on the very day that Mr. Thomas received the cheques. The order is for a stay of execution of the judgment which Mr. Thomas was charged with effecting. The application for the stay was supported by an affidavit which was also sworn to by Ms. Reid. Although that affidavit was sworn to on July 2, 2009, the application itself was filed on July 3. It seems that the order was secured after the cheques had already been issued. I shall refer to Ms. Reid's later affidavit in due course.

## The Company's stance

Mr. Hylton Q.C. made the submissions on behalf of the company. I hope I do him no disservice by summarizing the submissions thus:

a.     The bailiff's fees having been settled, Mr. Thomas' claim in that regard cannot succeed;

b.     None of the particulars of fraud set out in the Particulars of Claim amount to fraud;

c.     Having received an order for stay of the execution, the company was entitled to countermand the cheques;

d.      Mr. Thomas' particulars of claim does not disclose that he sustained damage and if no damage results from the company's action there is no cause of action;

e.      Mr. Thomas cannot argue that he will lead evidence of damage at the trial; it must be disclosed in his pleadings.

Learned Queen's Counsel submitted that the circumstances of the dishonouring of these cheques were outside the realm of deceit and fraud contemplated by the law concerning dishonoured cheques. He relied on, among others, the cases of *Three Rivers District Council v Bank of England (No. 3)* [2001] 2 All ER 513, *ED & F Man Liquid Products Ltd. v Patel and another* T.L.R. April 17, 2003 at page 224, [2003] ECWA Civ. 472, *Derry v Peek* (1889) LR 14 App. Cas. 337 and the unreported decision in *Stewart and others v Samuels* SCCA 02/2005 (delivered 18/11/05).

**Mr. Thomas' position**

Miss Archer, on behalf of Mr. Thomas submitted that there was a real prospect of success. Again, I summarize the submission, hoping that I do no disservice.

a.      The consequence of a dishonoured cheque is that an immediate cause of action accrues to the drawee against the drawer of that cheque;

b.      The drawee is entitled to recover more than just the face value of the cheque and nominal damages for the dishonour;

c.      The remedy may be in the form of general damages

d.      Mr. Thomas can prove the ingredients of the tort namely:

   (i)     "That the alleged representation consisted of something said, written or done which amounts in law to a representation;

   (ii)    That the Defendant was the representor;

   (iii)   That the Claimant was the representee;

   (iv)    That the representation was false;

   (v)     Inducement and materiality;

   (vi)    Alteration of position;

   (vii)   Fraud; and

   (viii)  Damage."

Among the cases cited by learned counsel were *Swain v Hillman* [2001] 1 All ER 91, *Gaynor v McDyer and another* [1968] IR 295, *Kpohraror v Woolwich Building Society* [1996] 4 All ER 119 and the unreported decision in *Anderson v The Attorney General and another* C.L. A. 017 of 2002 (delivered 16/7/2004).

**The Particulars of Claim**

The relevant portion of the amended Particulars of Claim states:

"8.    The Claimant avers that the Defendant in issuing the said dishonoured cheque acted fraudulently.

### PARTICULARS OF FRAUD

(a)    Presenting the Claimant with …cheques…well knowing that it was its intent to [countermand]/dishonour the said cheques.

(b)    Presenting the Claimant with dishonoured cheques.

(c)    Dishonouring/countermanding the said cheques.

(d)    Deceiving the Claimant into believing that the said cheques represented "settlement of the judgment debt, interest, costs and Bailiff's fees" [quoted from the covering letter] when it knew that it had no intention of paying the Claimant any Bailiff's fees.

(e)    Refusing to pay the Claimant, the relevant Bailiff's fees for the execution of the said Order for Seizure and Sale.

(f)    Deceiving the Claimant that by the presentation of the said cheques the Claimant's Bailiff's fees would have been paid.

(g)    Falsely representing to the Claimant that the said cheques were in settlement of the relevant Bailiff's Fees well knowing that this was not so.

(h)    Countermanding the said cheques given to the Claimant, the Claimant having executed the Order for Seizure and Sale.

(i)    Deceiving the Claimant that the presentation of the said cheques was in satisfaction of "the judgment debt, interest, costs and Bailiff's fees" upon the Claimant's execution of the Order for Seizure and Sale and then countermanding the said cheques.

(j)    Representing a falsehood to the Claimant, to wit, that the presentation of the said cheques was in satisfaction of "the judgment debt, interest, costs and Bailiff's fees" and then countermanding the said cheques.

9.    By reason of the matters aforesaid the Claimant has suffered loss and damage….

10.   Further, the Claimant has been embarrassed, humiliated and has suffered great distress by virtue of the Defendant's act of dishonouring the said cheques. At all material times the [Claimant] relied upon the honouring of the said cheques to pay the Assistant Bailiffs who had been commissioned by the Claimant to assist in the execution of the Order for Seizure and Sale. The Claimant suffered great distress and embarrassment in not being able to pay over to the Assistant Bailiffs that which was due to them in the face of their requests for payment….

### WHEREFORE THE CLAIMANT CLAIMS;

…

(ii)    Damages for Fraud…"

**The Law in relation to orders for summary judgment**

Part 15 of the Civil Procedure Rules 2002 (CPR) provides the guidance for assessing applications for summary judgment. Rule 15.2 sets out the test to be applied in applications of this type. It states, in part:

> "The court may give summary judgment on the claim or on a particular issue if it considers that –
>
> (a)     The claimant has no real prospect of succeeding on the claim or the issue..."

Undoubtedly, it is for the applicant, in this case the company, to establish that there is no such prospect. So said their Lordships in the case of *E.D. & F. Man Liquid Products Ltd.* mentioned above.

It is often said that the court is not entitled to embark on a mini-trial when assessing the prospects of success of a party's case. If the case is based on a point of law which is obviously bound to fail, or after relatively short argument proved to be so, then summary judgment may be granted. If, however, there are arguable points of law then summary judgment ought not to be granted. (See *Swain v Hillman* cited above.)

**Analysis**

*Does the claim for fraud have a real prospect of success?*

Mr. Hylton Q.C. criticized the fact that the Particulars of Claim did not refer to the tort of deceit. To his credit however, he did not submit that that was fatal to the claim. Part 8 of the CPR which stipulates what should

be included in Claim Forms and Particulars of Claim does not require special words or formulations. As will be shown below, there is precedent for a claim using the nomenclature of "fraud".

Learned Queen's Counsel sought to distinguish the facts of this case from that of a dishonoured cheque where a benefit, such as money's worth, was obtained by the drawer of the cheque. It is clear however that the company did achieve a benefit by drawing and delivering the cheques; it caused the bailiff to stay his hand.

Mr. Hylton also submits that the particulars of claim do not disclose fraud. I must, respectfully, differ from learned Queen's Counsel in that regard. Over and over again the pleadings allege that the company issued cheques with no intention of them being honoured. The inference is drawn from the contents of the covering letter and the fact that the cheques were countermanded. The company may well have an explanation showing that it acted honestly. It is for the company to provide that explanation.

*Kpohraror,* cited by Miss Archer, is authority for the principle that a person may recover substantial damages in contract for loss of business reputation, resulting from a cheque being wrongly dishonoured. That case involved a banker and its client and so is not on all fours with the instant case. It is sufficient basis, however, for the issue to be considered arguable.

The thrust of the company's case, I find, turns on what occurred after the cheques were issued. Mr. Hylton's submission is that the company, having secured a stay of execution, was entitled to countermand the cheques. That, in my view, is the crux of its case. Mr. Hylton cited no cases in support of the proposition. Assuming it to be a valid point (regardless of the absence of existing authority) however, it seems to me that it is a point which has to be supported by evidence. Ms. Reid's affidavit of October 5, does not give a reason for the company's action; she only exhibited the order for the stay. It seems to me that merely showing that a stay was granted is not enough to allow the company to secure its objective at this stage.

It is my view that the countermanding of a cheque calls for an explanation. The reasons motivating the countermanding of the cheques, is a matter of evidence for the company to adduce. This must be done at a trial and it is for the trial judge to decide whether the explanation is sufficient to amount to a successful defence to the claim.

### *Does Mr. Thomas' claim demonstrate that he has suffered loss?*

Learned Queen's Counsel submitted that a claimant can get no damages for embarrassment humiliation and distress. As part of that submission he asserted that there was not sufficient particularity in Mr. Thomas' claim of loss to allow a court to award Mr. Thomas damages.

Mr. Hylton emphasised that the payment of the second cheque was made later in July 2009. Relying on *Derry v Peek,* cited above, Mr. Hylton correctly submitted that there can be no liability if there is no loss. Therefore, runs the submission, if Mr. Thomas can prove no damage, then the claim must fail.

On the question of insufficient particularity, Mr. Hylton relied on the judgment of Harris J.A. in *Gordon v Stewart* SCCA 02/2005 (delivered 18/11/2005), as authority for the proposition that the deficiency in the pleadings cannot be cured by evidence at trial. At the stage of the application for summary judgment, says Mr. Hylton, the judge hearing the application has to consider the evidence available at that point in time.

I find that, in applying the principle to the instant case, Mr. Hylton is not on good ground. Firstly, there is authority for general damages to be awarded for deceit. In *Shelley v Paddock and another* [1979] 1 Q.B. 120 a plaintiff, who had been swindled out of her money in a fraudulent real estate deal, secured a judgment for substantial general damages for the distress resulting from the fraud. Bristow, J, in a fairly brief discourse, at page 131, dealt with the issue this way:

> "[The defendant's counsel] ...very candidly and realistically says that this being an action in fraud, there is no principle which prevents [the plaintiff] from recovering damages for mental and physical suffering which the fraud may have caused....on principle it seems to me – and this is a principle illustrated also in the

law of libel where your right to the integrity of your reputation has been infringed – she is entitled to recover damages under that head and I shall award the £500 which she claims."

The decision was upheld on appeal (*Shelley v Paddock and another* [1980] 1 All ER 1009) but, considering the concession by the defendant's counsel, it does not appear that any complaint was made at the appellate level, against this aspect of the judgment. It is significant to note that the cause of action, even in those pre-CPR days, was said to be "fraud".

The entitlement to damages for mental distress and injured feelings was recognized by counsel on both sides in *Archer v Brown* [1985] 1 Q.B. 401. The learned trial judge relied on *Shelley v Paddock,* cited above, among the cases on which he relied in awarding £500 for general damages under this head. The learned author of *McGregor on Damages* 16th Ed. at paragraph 1993 criticized some of the learned judge's reasoning on the point in *Archer v Brown* but accepted the validity of the award.

The second observation on Mr. Hylton's submission is that I find that the pleading does have sufficient particularity to ground the claim. In his amended Particulars of Claim, Mr. Thomas described at paragraph 10, quoted above, that his embarrassment and humiliation arose from the fact that he was unable to pay his Assistant Bailiffs who had accompanied him on that particular job.

Rule 8.9 (2) of the CPR requires that the statement of case must be as short as is practicable. In this era of the CPR, there is no requirement that pleadings must be exhaustive. The basics of the statement of case must be contained in the document but it must be borne in mind that the witness statements will be provided to the defendant in good time. This will sufficiently alert that party as to the case it will have to meet at trial.

In considering all these matters, I find that the company has failed to convince me that its application should succeed.

**Conclusion**

The complaints against the pleadings in Mr. Thomas' statement of case are not well founded. There are sufficient particulars to show that his claim does have a real prospect of success. Assuming that Mr. Thomas' evidence supports those pleadings, then it would be for the company to show why it countermanded the cheques and whether it was entitled so to do.

The orders therefore are:

1. The application for summary judgment is refused;

2. The time for the Defendant to file and serve its defence is hereby extended to 31st March, 2010;

3. Costs to the Claimant to be taxed if not agreed.